**Affirmed and Memorandum Opinion filed November 3, 2016.**



In The

# Fourteenth Court of Appeals

## NO. 14-16-00384-CV

## IN THE INTEREST OF L.T.B. AND L.M.A., CHILDREN

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2015-02943J**

## M E M O R A N D U M   O P I N I O N

The trial court terminated the parental rights of S.S.A. ("Mother") with respect to two of her children, Lizzie and Leigh,[1] and appointed appellee Texas Department of Family and Protective Services ("the Department") to be the children's managing conservator. The court also terminated the rights of the fathers of the children; the fathers do not appeal. Mother challenges the sufficiency of the evidence to support the judgment. We affirm.

---

[1] We use fictitious names for the children discussed in this opinion. *See* Tex. R. App. P. 9.8(b)(2). Mother's third child lives with the child's father, and Mother's rights regarding that child are not at issue in this case.

BACKGROUND

The Department received a report in early April 2015 of neglectful supervision and physical abuse of Lizzie, then age ten, and Leigh, then age eight. The referral alleged Mother was inappropriately disciplining the girls, including hitting them on the face, chest, and back. Department caseworker Sharise Washington visited the children and found they both appeared clean and healthy. Neither girl disclosed abuse or neglect. Washington asked Mother to submit to a drug test. Mother agreed and went to a testing facility the next day, but she arrived with a sample of someone else's urine to be tested instead of hers. She had a hair follicle test a week later and was positive for cocaine and marijuana.

Mother had been referred to the Department for allegations of abuse and neglect three times before the 2015 referral. She had twice participated in the Department's Family Based Safety Services ("FBSS") program. FBSS would not accept her into the program with respect to the April 2015 referral due to her Department history. Therefore, the children went to stay with their maternal grandmother and step-grandfather as part of a Parental Child Safety Agreement between Mother and the Department. The agreement required Mother to live separately from the grandparents and allowed only supervised visits with the girls.

Mother was admitted to Santa Maria Hostel for inpatient drug rehabilitation in early May 2015. According to her therapist at Santa Maria, she was actively participating and receiving drug treatment services through the summer. She tested negative for drugs in early July. On August 25, 2015, however, she pleaded guilty to and began serving her sentence on a theft charge that was pending at the time the children were removed.[2] Following her release, Mother was admitted to Sally's

---

[2] Mother was sentenced to 180 days in Harris County jail. The record suggests she served about 30 days of that sentence before being released.

House, a temporary home for women who have completed a drug rehabilitation program.

Kimberly Bramlett of Child Advocates, Inc., the girls' guardian ad litem, met with Lizzie at her school in December 2015. Lizzie reportedly told Bramlett that if she or Leigh get in trouble, their step-grandfather puts them in time out, makes them kneel on raw grains of rice, or gives them a "whooping." Child Advocates considered that discipline a violation of the Department's rule, of which the grandmother and her husband were aware, that the girls not be physically disciplined. Further, Lizzie said she and Leigh spent one night the previous weekend at their paternal grandparents' house with Lizzie's father, who had recently been released from prison. It is not clear from the record whether that visit was approved by the Department in accordance with the trial court's order regarding visitation. Following a hearing, the trial court ordered that the girls be moved from the maternal grandparents' house to a foster home. They remained in that foster home through trial.

Trial was held on March 29, 2016. The Department presented testimony from caseworker Monica Farrow, drug testing facility owner Bruce Jeffries, and Child Advocates volunteer Mabel Rogers. Mother testified and offered documentary evidence but did not call other witnesses.

The trial court's judgment states Mother engaged in the conduct described in subsections E (endangerment), O (failure to comply with court order), and P (substance abuse in certain situations) of section 161.001(b)(1) of the Family Code.[3] *See* Tex. Fam. Code Ann. § 161.001(b)(1). The judgment also states

---

[3] The numbering of section 161.001 changed effective April 2, 2015. Section 161.001(1) is now section 161.001(b)(1). Although the trial court's judgment cites the previous version, Mother's case began after April 2, 2015 and is therefore governed by the current version. We refer to the current version in this opinion.

3

termination of Mother's parental rights is in the children's best interest. *Id.* § 161.001(b)(2).

On appeal, Mother challenges the sufficiency of the evidence to support the trial court's findings. She does not challenge the appointment of the Department as managing conservator.

ANALYSIS

I.     **Burden of proof and standards of review**

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re S.R.*, 452 S.W.3d 351, 357 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Although parental rights are of constitutional magnitude, they are not absolute. The child's emotional and physical interests must not be sacrificed merely to preserve the parent's rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *accord J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *S.R.*, 452 S.W.3d at 358.

Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act described in section 161.001(b)(1) of the Texas Family Code, and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b). Only one predicate finding under section 161.001(b)(1) is necessary to support a decree of termination when there is

4

also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

In reviewing the legal sufficiency of the evidence in a termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *See In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *J.F.C.*, 96 S.W.3d at 266; *C.H.*, 89 S.W.3d at 25. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could have disbelieved. *J.O.A.*, 283 S.W.3d at 344; *J.F.C.*, 96 S.W.3d at 266.

In reviewing termination findings for factual sufficiency of the evidence, we consider and weigh all the evidence, including disputed or conflicting evidence. *See J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.F.C.*, 96 S.W.3d at 266. We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

## II. Sufficient evidence supports the trial court's finding of endangerment.

### A. Legal standards

Parental rights may be terminated if a parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *S.R.*, 452 S.W.3d at 360.

The evidence must show the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A court properly may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffers injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.B.*, 412 S.W.3d 588, 599 (Tex. App.—Fort Worth 2013), *aff'd*, 437 S.W.3d 498 (Tex. 2014).

Courts may consider conduct both before and after the Department removed the child from the home. *See Avery*, 963 S.W.2d 550, 553 (Tex. App.—Houston

[1st Dist.] 1997, no writ) (considering persistence of endangering conduct up to time of trial); *In re A.R.M.*, No. 14–13–01039–CV, 2014 WL 1390285, at *7 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.) (considering pattern of criminal behavior and imprisonment through trial).

### B.    Criminal history

Evidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of the child. *In re S.R.*, 452 S.W.3d at 360–61; *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.).

Mother was charged in Harris County with theft of property valued at more than $50 and less than $500 in October 2007. She pleaded guilty and was sentenced to 20 days in county jail. In November 2009, she was convicted of a similar theft in Fort Bend County. The record does not indicate her sentence for that conviction.

In April 2010, Mother was indicted for attempting to obtain a controlled substance by a fraudulent prescription, a third-degree felony. She pleaded guilty, was placed on deferred adjudication for two years, and was ordered to serve 30 days in county jail. The State filed a motion to adjudicate guilt in January 2013, alleging many drug-related violations of the terms of her community supervision. The alleged violations included: (1) unlawfully obtaining or attempting to obtain a dangerous drug, alprazolam, in September 2010; (2) adding Xanax to a prescription given to her by her psychiatrist in September 2010, which resulted in her unsuccessful discharge from a drug and alcohol treatment program; (3) using marijuana as evidenced by tests conducted in September 2012 and December 2012;

7

and (4) failing to attend or provide proof of attendance at Alcoholics Anonymous meetings.

After the State filed its motion to adjudicate, the trial court issued an arrest warrant for Mother. She was arrested on April 16, 2013, but gave the arresting officer a false name, a class A misdemeanor. Mother was charged with that offense.

The trial court signed a judgment adjudicating guilt on April 23, 2013 and sentenced Mother to two years' imprisonment in the Institutional Division of the Texas Department of Criminal Justice. Two weeks later, she pleaded guilty to the false-name charge and was sentenced to 45 days' confinement in county jail. The record does not reflect how much of either sentence she served.

Mother was free by June of 2014, however, because she was arrested at that time for theft as a third offender. She and the State entered a plea bargain by which she pleaded guilty to the lesser charge of theft. The trial court sentenced her to serve 180 days in county jail.[4]

## C.    Drug use

A parent's drug use can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *See S.R.*, 452 S.W.3d at 361; *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Continued drug use may be considered as establishing an endangering course of conduct. *S.R.*, 452 S.W.3d at 361–62.

As discussed above, Mother has a history of drug use. She pleaded guilty to attempting to obtain a controlled substance by a fraudulent prescription in April 2010, and the State alleged she made a second attempt in September 2010. She

---

[4] This sentence is the one mentioned in the background section of this opinion.

8

ingested marijuana in violation of the terms of her community supervision at least twice in late 2012.

Mother tested positive for cocaine and marijuana in late April 2015. Bruce Jeffries, who owns the drug testing facility at which Mother was tested, testified that her cocaine level of 2,681 picograms meant she used cocaine more than once but not every day. Her marijuana level of .1 picogram was "very low" and "right at the cut off level."

Mother began inpatient drug rehabilitation treatment in early May 2015. She was negative for all tested substances when she submitted to a urinalysis and hair follicle test in early July. She was in jail for roughly a month beginning at the end of August. When tested on October 6, 2015, she was again negative for drugs.

Beginning a few months later, though, Mother was positive for drugs each time she was tested. She was positive for opiates and marijuana in December 2015; cocaine, marijuana, and alcohol in January 2016; and opiates and benzodiazepine in February 2016. Mother attributed some of her drug use to depression from not being with her children. She claimed the other positive results were simply wrong.

### D. Conclusion on endangerment

Considered in the light most favorable to the trial court's finding, the evidence is legally sufficient to support the trial court's determination that termination of Mother's parental rights was justified under section 161.001(b)(1)(E) of the Family Code. *J.O.A.*, 283 S.W.3d at 344; *J.F.C.*, 96 S.W.3d at 266. Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under section 161.001(b)(1)(E). Accordingly, we conclude the evidence is factually sufficient to support the section 161.001(b)(1)(E) finding.

9

In light of our conclusion regarding the trial court's finding on subsection E, we need not make a determination as to its findings on subsections O or P. *See A.V.*, 113 S.W.3d at 362. We overrule Mother's first three issues.

## III. Sufficient evidence supports the trial court's best-interest finding.

In Mother's fourth issue, she asserts the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the children's best interest. We review the entire record in deciding a challenge to the court's best-interest finding. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013).

Termination must be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(2). There is a strong presumption that the best interest of a child is served by keeping the child with the child's parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Prompt, permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best-interest finding: the desires of the child; the physical and emotional needs of the child now and in the future; the emotional and physical danger to the child now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). As noted, this list of factors is not exhaustive, and evidence is not required on all the factors to

support a finding that termination is in the child's best interest. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

In addition, the Family Code sets out thirteen factors to be considered in evaluating a parent's willingness and ability to provide the child with a safe environment. *See* Tex. Fam. Code Ann. § 263.307(b). Those factors are: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child with: (a) minimally adequate health and nutritional care; (b) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (c) guidance and supervision consistent with the child's safety; (d) a safe physical home environment; (e) protection from repeated exposure to violence even though the violence may not be directed at the child; and (f) an understanding of the child's needs and capabilities; and (13) whether an

11

adequate social support system consisting of an extended family and friends is available to the child. *Id.*; *R.R.*, 209 S.W.3d at 116.

## A. The children and their foster parents

Caseworker Monica Farrow testified about the girls' progress throughout the case. Neither Lizzie nor Leah testified.

From April through December 2015, the girls lived with their maternal grandparents. They were moved to a foster home on December 15, 2015, on the trial court's order following reports of inappropriate discipline by their step-grandfather.

The girls experienced some difficulty adjusting to the move, in part because they did not get to spend Christmas with their grandparents as expected. Both Lizzie's and Leigh's grades slipped when they returned to school in January, but they were improving at the time of trial. Lizzie was receiving special education services due to deficiencies in reading and math. Leigh was in a mainstream class. They each saw a therapist weekly while they lived with their grandparents, and they continued sessions with the same therapist after the move.

Both girls were described as happy in the foster home, though they both missed their family. Lizzie enjoyed visiting her maternal aunt; they would have "movie night" or "girls' night in." Leigh, reportedly more emotional than her sister, cried at times because she wanted to be with her family.

Once in the foster home, Lizzie was diagnosed with scoliosis. She has over 50% curvature of the spine. Lizzie said she told her maternal grandmother about her back pain, and the grandmother gave her ibuprofen, but it didn't help. The doctor explained that Lizzie would need surgery eventually but was too young to have it. Instead, she is to wear a back brace 18 hours a day to slow the progression

of the curving. Lizzie has also been diagnosed with attention deficit hyperactivity disorder, for which she takes medication.

Farrow and Mabel Rogers, the Child Advocates volunteer, both believed it was in the girls' best interest for Mother's parental rights to be terminated and for the girls to remain in the foster home, even though the foster parents were not willing to adopt. Living with Mother was not in their best interest, Farrow testified, due to Mother's ongoing substance abuse, inconsistency with completing required psychological and drug-treatment services, lack of suitable home, and instability of employment. Rogers testified Lizzie and Leigh had bonded with their foster parents and were doing much better in school.

### B. Mother

*Endangerment.* The evidence that Mother endangered her children, detailed above, is relevant to the best-interest analysis. *S.R.*, 452 S.W.3d at 366.

*Department history.* Mother was referred to the Department three times before the events at issue in this case. The appellate record does not reflect the details of the referrals.

The Department received a report in June 2005 of Mother's neglectful supervision of Lizzie, who was almost a year old. The Department could not locate Mother but found risk was indicated. The case was referred to FBSS, and Lizzie was placed with her maternal grandmother.

Mother was again reported on August 1, 2006, for neglectful supervision of Leigh, who was born the previous day. The Department ruled the allegations "unable to determine" and again referred the case to FBSS. Mother participated in FBSS through the beginning of 2009. At that time, the Department found that the risk was reduced because Mother tested negative for drugs, was under the care of a psychiatrist, was taking her medication, and had family support.

13

A third report was made in September 2010 alleging neglectful supervision by Mother of Lizzie, Leah, and Mother's third child. The Department ruled out those allegations.

*Failure to complete court-ordered services.* The trial court ordered Mother to complete the family service plan created for her by the Department. She was required to, among other things, successfully complete inpatient and subsequent outpatient drug treatment. She had to attend daily Alcoholics Anonymous and/or Narcotics Anonymous meetings, obtain a sponsor, and participate in groups and lectures focusing on relapse dynamics and prevention. Mother was subject to random drug testing. She had to complete a 6–8 week parenting class and provide the certificate of completion to her caseworker. Mother was required to have psychological, psychosocial, and substance abuse assessments and follow the assessors' recommendations. Further, she was obligated to obtain and maintain a job and a safe home and provide documentation of both.

Mother did not complete several portions of the service plan. Though she was admitted for inpatient drug rehabilitation and was doing well in the program, she did not follow the recommendations for her outpatient treatment. She scheduled but failed to appear at some of the required assessments and counseling sessions. Mother's proffer of hospital records concerning a March, 2016 admission reflect the reason for her visit was "Altered Mental Status, Possible Benzo Withdrawal."

Mother failed to comply with the requirement that she maintain stable employment or demonstrate, by monthly income statements or copies of the enrollment papers, that she is enrolled in a vocational or educational training program. She said she was attending cosmetology school and earning money through the school's work-study program, but she did not submit documentation of

14

her employment. Mother provided evidence of prior enrollment at Jay's Technical Institute. Those records indicate she started classes in February 2009 and last attended class in May 2009. Her attendance rate was 38.32%. As of June 2016, her enrollment status was "withdrawn."

Further, Mother did not provide a lease agreement or mortgage in her name to prove she acquired and maintained stable housing for more than six months. After she was released from jail, roughly six months before trial, she had a room at Sally's House. She left after two months so she could get a job; she said she would have been required to live at Sally's House for four to five months before she would be permitted to work or attend school. Following Sally's House, she lived with her sister, then with a male friend, and then with another male friend. At some point thereafter, Mother told the caseworker she had her own housing, but she did not provide the lease or other documentation. At the time of trial, Mother was reportedly living with two female roommates in an apartment. When asked whether she was able to "afford the rent," Mother testified she was currently relying on a church to assist them in paying rent and obtaining food.

## C.    Conclusion on best interest

The evidence shows that Lizzie and Leigh were doing well in their foster home. Lizzie has educational and physical needs that require special attention, and the foster parents are attending to both. Mother has a history of drug abuse and drug-related crimes. Though she made progress towards sobriety in the first several months this case was pending, she relapsed and tested positive for drugs three times in the five months before trial. She was not able to provide a stable home for the children at the time of trial.

Considering all the evidence, we conclude the evidence is legally and factually sufficient to support the trial court's finding that termination of Mother's parental rights is in the children's best interest. We overrule Mother's fourth issue.

## CONCLUSION

We affirm the trial court's judgment.

/s/    J. Brett Busby
Justice

Panel consists of Justices McCally, Busby, and Donovan.